

# NUMBER 13-22-00034-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE INTEREST OF J.K.W., MINOR CHILD

---

### On appeal from the 423rd District Court
### of Bastrop County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Tijerina, Silva, and Peña
### Memorandum Opinion by Justice Tijerina

Appellant Mother appeals the trial court's permanent injunction enjoining Mother from allowing her child J.K.W. to be in the presence of J.K.W.'s paternal grandparents (the grandparents) until the age of sixteen (if J.K.W. chooses).[1] By her sole issue, Mother

---

[1] For the child's privacy, we refer to the child by an alias and family members by their relationships to the child. *See* TEX. R. APP. P. 9.8; *see also* TEX. FAM. CODE ANN. § 109.002(d).

asserts that the evidence is legally and factually insufficient to support the injunction and that the permanent injunction was not in J.K.W.'s best interest. We affirm.[2]

## I.   BACKGROUND[3]

Mother and appellee Father were divorced in 2014 and were appointed joint managing conservators. In 2015, Father filed suit to modify parent-child relationship (SAPCR). The trial court appointed Father as the sole managing conservator, and Mother was appointed possessory conservator of J.K.W.[4] The trial court further ordered that visitation between Mother and J.K.W. "shall be at the sole discretion of" Father "and upon the terms and conditions established by" him. Mother was ordered to pay child support.

On August 17, 2020, Mother filed a petition to modify the SAPCR. Mother requested that the trial court award her the exclusive right to designate J.K.W.'s primary residence, her right to receive child support from Father, and that the trial court order that Father exercise a supervised standard possession order. On November 5, 2020, Father filed a counterpetition to modify the SAPCR. Father stated that the child support awarded to him should be increased by at least fifty percent in accordance with the guidelines. In December 2020, the trial court appointed Mother and Father temporary joint managing conservators.

On February 8, 2021, Father amended his counterpetition requesting a permanent injunction against Mother, enjoining her from allowing J.K.W. to be in the presence of the

---

[2] Appellee Father did not file a brief to assist us in the resolution of this matter.

[3] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[4] Mother was battling a drug addiction during this time.

2

paternal grandparents at any time. J.K.W.'s attorney ad litem and guardian ad litem filed a report with the trial court, stating that Mother and "her allies" had filed numerous complaints with Child Protective Services against Father, and all the complaints had been ruled out. The ad litem further stated that Mother and her attorney have acted in bad faith regarding the original appointment of the ad litem and that Mother's modification request was frivolous because Mother was behind in her child support payments. The trial court held a hearing on June 10, 2021 and July 22, 2021.

## A.    Mother's Testimony

At the hearing, Mother testified that after Mother's sobriety, the paternal grandparents commended and wished Mother well. Thereafter, the paternal grandparents facilitated a relationship with Mother. Mother stated that it was not in J.K.W.'s best interest to have zero contact with the paternal grandparents because they have always loved J.K.W., and J.K.W. "adores them. And she wants to call them regularly. She wants to go see them regularly. She enjoys the time she spends with them." Mother stated that the paternal grandparents have been paying Mother's legal fees in this case. According to Mother, the paternal grandparents have not done anything that would warrant them not having contact with J.K.W., and the reason why Father wants to prohibit J.K.W.'s contact with his parents is because of a "stressed relationship between them."

On cross-examination, Mother admitted that Father's other siblings do not allow their children to see the paternal grandparents. That is, there was no visitation of any type, and Mother understood that it was not just Father. Nonetheless, Mother stated it was important for J.K.W. to see the paternal grandparents.

3

**B.    Shanna's Testimony**

Father's sister, Shanna, testified that her children have not seen her parents in over six years. Shanna stated that her son "was in so much emotional distress when he was with [her] parents that he ended up locking himself in the bathroom. He was nine years old at the time. And they had to take the doorknob off the door to get him because he was so upset." Shanna stated that when her daughter told Shanna what happened, Shanna's parents got very upset.

According to Shanna, her parents were physically, emotionally, and verbally abusive to Shanna and her siblings growing up, including Father. "And so when I saw the behavior in my children, when they were behaving in a manner that indicated that there was some kind of trauma, I cut off all communication with my parents. Because I'm not going to allow that to happen to them," Shanna stated.

Shanna explained that her parents did not allow Shanna to report the abuse they inflicted on her because her father was one of three sheriff's deputies. So, her father told her to "go ahead [and report it] because the man who had come over and had dinner with us was the child abuse investigator for our area," and they would not believe Shanna over her father. Shanna testified that she was sexually abused as a child and nothing was done about it because "[i]t was handled within the family." For this reason, Shanna became a therapist, specializing in "trauma and early childhood trauma in adults." She explained that she got the help she needed as an adult and realized that there were more people dealing with repercussions of trauma, whom she now helps. Shanna stated it was

"absolutely" in the best interest of her children and J.K.W. to have zero contact with her parents.

## C.    Father's Testimony

Regarding physical abuse, Father explained that in one instance, his parents hit him with a board until it broke. And his parents got mad and continued to hit him with a metal spatula. He stated his parents also used an extension cord, fly swatters, and belt buckles to beat him. According to Father, his mother would slap him in the face, and as soon as his father arrived, he would get it again from his father. Father also informed the trial court that his parents were very manipulative, and Father was not allowed to be inside the home unless it was raining. Father stated he was hospitalized every year due to pneumonia because his parents raised him in a house full of mold. Father stated that Shanna left the home when she was fifteen years old because of the abuse.

Father stated that although Mother was offered standard possession, she "would be busy with her boyfriend, going to the river, or something, so she couldn't get [J.K.W.]," and it was not until "the last eleven months before this case, [Mother] had finally started doing regular visitation." Father testified that he told Mother "everything [his] parents have done in the past to both [him] and [his] sister about physical harm, mental harm, everything," and her response was "well, we're not going to discuss this." Father stated that even though Mother had temporary visitation for a seven-day period, Mother sent J.K.W. to his parents for five of those seven days—despite his objection. Therefore, Father requested that Mother be enjoined from permitting J.K.W. visitation with his parents.

5

**D.     Ad Litem and L.W.**

In his opening statement, the guardian ad litem and attorney ad litem stated he was "mystified" as to why Mother "was being so aggressive, when [J.K.W.] was in a safe place." He further stated that Mother "ha[d] some behaviors that could pose a danger for [J.K.W.]" in her aggressiveness and that "limiting the father's rights has been a concern." The ad litem further opined that "the animosity" in this case was "largely emanating from [Mother] towards [Father]."

Father's cousin L.W. similarly testified that he was aware that the paternal grandparents regularly abused Father when Father was a child.

**E.     Ruling**

The trial court appointed Mother and Father joint managing conservators. The trial court further granted the permanent injunction prohibiting J.K.W. from being in the presence of the paternal grandparents until she is sixteen years of age—at which point J.K.W. may choose to visit the paternal grandparents.[5] Mother appealed.

Mother requested findings of fact and conclusions of law. In its findings of fact and conclusions of law, the trial court found that Mother "provided minimal participation in the rearing of [J.K.W.] for the approximate five years prior" to the SAPCR; Father "provided a safe, loving and supportive home for [J.K.W.]"; Father "gave first priority to the welfare of [J.K.W.]"; "the only home [J.K.W.] has truly known, prior to the filing of this suit, has been the home of" Father; and Mother "voluntarily relinquished possession and control of [J.K.W.] from 2015 to 2018."

---

[5] J.K.W. is currently eleven years old.

## II.   APPLICABLE LAW AND STANDARD OF REVIEW

"[T]he Texas Family Code does not expressly address the situations in which a trial court may issue a permanent injunction in a SAPCR proceeding." *Gerges v. Gerges*, 601 S.W.3d 46, 61 (Tex. App.—El Paso 2020, no pet.). However, it is well established that the trial court may issue a permanent injunction when it is in the best interest of the child. *Id.*; *see, e.g.*, *Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied) ("We find no bar to incorporating language of injunction into a divorce decree."); *Messier v. Messier*, 389 S.W.3d 904, 908 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[C]ourts routinely grant permanent injunctions" in child custody cases "consistent with the best interests of the children."). A trial court may impose "restrictions or limitations on a parent's right to possession of or access to a child," with the caveat that they do "not exceed those that are required to protect the best interest of the child." TEX. FAM. CODE ANN. § 153.193; *see also id.* § 153.072 (explaining that the trial court "may limit the rights and duties of a parent appointed as a conservator if the court makes a written finding that the limitation is in the best interest of the child").

We review the trial court's decision to impose a permanent injunction regulating a parent's conduct under an abuse of discretion standard. *Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see In re H.D.C.*, 474 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (recognizing that a trial court has "broad discretion in fashioning restrictions on a parent's possession and access that are in the best interest of the child"). A trial court does not abuse its discretion "if some evidence of a substantive and probative character exists to support the trial court's

7

decision and that decision constitutes a correct application of the law." *Messier*, 389 S.W.3d at 909. "Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds for asserting error, but are relevant factors in assessing whether a trial court abused its discretion." *Id.* "We must consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence." *Id.*

## III.   DISCUSSION

By her sole issue, Mother contends that the trial court erred by granting the permanent injunction because the evidence was legally and factually insufficient to support it and that it was not in J.K.W.'s best interest to prohibit Mother from allowing J.K.W. to be in the presence of the paternal grandparents before J.K.W. turns sixteen years of age.

Specifically, Mother argues that we should follow our sister court in *In re A.A.N.* and conclude that the party seeking a permanent injunction in a SAPCR must plead and prove (1) a wrongful act, (2) imminent harm, (3) irreparable injury, and (4) absence of an adequate remedy at law. *See* No. 02-13-00151-CV, 2014 WL 3778215, at *1 (Tex. App.— Fort Worth July 31, 2014, no pet.) (mem. op.). However, relying on *In re S.V.*, this Court recognized that those "requirements are not strictly applied in the child custody context." *In re J.P.*, No. 13-18-00648-CV, 2020 WL 103858, at *9 (Tex. App.—Corpus Christi– Edinburg Jan. 9, 2020, pet. denied) (mem. op.) (citing *In re S.V.*, 599 S.W.3d 25, 42 (Tex. App.—Dallas 2017, pet. denied) ("[I]njunctions contained in a SAPCR order need not meet [the traditional injunction] prerequisites.")); *see also Leithold v. Plass*, 413 S.W.2d

698, 701 (Tex. 1967) ("Technical rules of practice and pleadings are of little importance in determining issues concerning the custody of children."); *cf. King v. Lyons*, 457 S.W.3d 122, 131 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("But in cases in which the injunctive relief sought or granted does not concern custody, control, possession, or visitation of a child, the party seeking such relief must show his entitlement to a permanent injunction as in any civil case.").

Here, Father, Shanna, and L.W. testified that the paternal grandparents physically, mentally, and verbally abused Father and his siblings. *See In re S.V.*, 599 S.W.3d at 42 (upholding a permanent injunction based on undisputed evidence in the record that father struck one of the children in the face at least once). Shanna explained that she was sexually assaulted as a child, yet she was prohibited from reporting the abuse because her father, a law-enforcement officer, threatened her. As a licensed trauma therapist, Shanna now helps others in similar situations that experience trauma as adults due to their abusive childhoods. In fact, all of Father's siblings did not allow their children to be in the presence of the grandparents. Shanna stated it was "absolutely" in the best interest of J.K.W. to have zero contact with her parents.

According to Father, he suffered numerous instances of physical abuse from his parents: he was hit with a board until it broke; a metal spatula, extension cord, fly swatter, and belt buckle; he was slapped; and he was not allowed inside the house. *See In re L.C.L.*, 396 S.W.3d 712, 717 (Tex. App.—Dallas 2013, no pet.) ("A single act of violence or abuse can constitute a 'history' of physical abuse for purposes of . . . the Texas Family Code."). Given Father's, Shanna's, and L.W.'s testimony, we conclude there was

9

sufficient evidence from which the trial court could have determined that it was in J.K.W.'s best interest to prohibit her from being in the presence of the paternal grandparents until she turned sixteen years of age.

Mother asserts that this evidence is insufficient because the behavior Father references occurred twenty years prior to trial, and there was no evidence that the paternal grandparents had ever mistreated J.K.W. However, "an adult person's future conduct may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied); *see also In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2007, no pet.) (mem. op.) ("Because there is evidence that appellant's past actions were unsuitable, the trial court could have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant."). Moreover, Shanna testified that her son "was in so much emotional distress" when he visited her parents, he locked himself in the bathroom and the door had to be removed so that he would exit it. In addition, Shanna stated that her parents tried to "manipulate" Shanna's daughter, telling her "to keep things from" Shanna in an attempt to "form[] a wedge between" Shanna and her daughter. Shanna further stated that her parents treated Shanna's daughter "very, very differently than they treated" Shanna's son.

The trial court could have measured the paternal grandparents' future conduct by their recent deliberate past conduct with Shanna's children. *See May*, 829 S.W.2d at 377. Therefore, there is sufficient evidence to support the trial court's reasonable conclusion

10

that the paternal grandparents may similarly mistreat J.K.W. and that it is in J.K.W.'s best interest to prohibit her from being in their presence. *See* TEX. FAM. CODE ANN. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."); *Messier*, 389 S.W.3d at 910 (recognizing that a trial court may "grant, deny, restrict, or limit any of a possessory conservator's rights, privileges, duties, and responsibilities with respect to the child as is necessary to protect the child's best interest"); *see also Elshafie v. Elshafie*, No. 13-10-00393-CV, 2011 WL 5843674, at *3 (Tex. App.—Corpus Christi–Edinburg November 22, 2011, no pet.) (mem. op.). Accordingly, the trial court did not abuse its discretion by finding that it was in J.K.W.'s best interest to permanently enjoin Mother from allowing J.K.W. to be in the paternal grandparents' presence until she turned the age of sixteen. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (providing that trial courts are given wide latitude in determining the best interest of the children); *Capello v. Capello*, 922 S.W.2d 218, 220 (Tex. App.—San Antonio 1996, no writ) ("The trial court, in considering the best interest of the child, had the discretion to weigh and compare appellant's inconvenience with the safety and well-being of the child."). We overrule Mother's sole issue.

## IV.  CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Delivered and filed on the
13th day of July, 2023.

11